**CITY OF CINCINNATI, Plaintiff,**

v.

**DEUTSCHE BANK NATIONAL TRUST CO., et al, Defendants.**

**Case No. 1:12–cv–104.**

United States District Court, S.D. Ohio, Western Division.

Oct. 10, 2012.

Catherine Elizabeth Howard, City of Cincinnati, Jessica Leigh Powell, Legal Aid Society of Cincinnati, Paula Boggs Muething, Cincinnati, OH, for Plaintiff.

Carolyn Ann Taggart, Kendall Verrett Shaw, Porter Wright Morris & Arthur, LLP, James Eugene Burke, Keating Muething & Klekamp, Lawrence C. Baron, Hamilton County Prosecutor's Office, Cincinnati, OH, Elizabeth A. Frohlich, Morgan, Lewis & Bockius, LLP, San Francisco, CA, David Dunn, Jordan Estes, Peter Dennin, Hogan Levells U.S., New York, NY, for Defendants.

## ORDER

SANDRA S. BECKWITH, Senior District Judge.

Before the Court are motions to dismiss filed, respectively, by Defendants Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, and Deutsche Bank AG (Doc. 40); Deutsche Bank National Trust Company as Trustee, and Deutsche Bank Trust Company Americas as Trustee (Doc. 41); and by Wells Fargo Bank, N.A. and Wells Fargo Bank, N.A. as Trustee (Doc. 38). Plaintiff, the City of Cincinnati, has filed its opposition memoranda (Docs. 53, 54, 55), and the Defendants have filed replies (Docs. 57, 58, 56).

For the following reasons, the Court will grant in part and deny in part the motions.

## FACTUAL BACKGROUND

The City of Cincinnati originally filed a complaint against the Deutsche Bank enti-

ties, Wells Fargo Bank, and the Treasurer of Hamilton County, Ohio, in the Ohio common pleas court on December 21, 2011. (Doc. 18) The City amended its complaint a few weeks later and, after Defendants removed the case to this Court, filed a second amended complaint. (Doc. 29) That operative complaint generally seeks injunctive and declaratory relief and damages against the Defendant banks, alleging that as owners of residential properties, they have engaged in "unlawful public nuisance property maintenance business practices" within the City. The complaint preliminarily asserts that the Defendants unlawfully

> ... decide whether or not to comply with state and local property maintenance laws based solely on the economics associated with the particular property they own. Thus, in some neighborhoods in the City, the banks routinely ignore state and local property maintenance laws because compliance with these laws requires the banks to expend funds they do not expect to recover. If doing so does not provide an economic benefit, Deutsche Bank and Wells Fargo will not comply with the law. This unlawful public nuisance business practice leads directly to blighted public nuisance properties in the City and systematically privatizes economic gain (to the benefit of Deutsche Bank and Wells Fargo) and socializes economic loss (to the detriment of the City and its citizens).

(Doc. 29, paragraph 1)

The City further alleges that the Defendants own properties as trustees of various residential mortgage-backed trusts. Exhibits B and C to the complaint contain a list of these "nuisance properties" that the City alleges were owned by the Deutsche Bank entities and Wells Fargo, respectively, when the complaint was filed. These exhibits identify the property address, some purchase and sale date information, the type of code violation citations, and unpaid amounts assessed under several City ordinances. The City asserts that it cannot identify other noncompliant properties that the Defendants may have acquired after it filed its complaint, but alleges that those properties are also "... within the scope of this Amended Complaint because they implicate [Defendants'] public nuisance business practices that proximately cause the creation and perpetuation of public nuisance properties." (Doc. 29, ¶ 19) These properties are vacant "problem buildings" that have been the subject of orders, citations, and violation notices from the City because they fail to meet minimum required property standards. Despite being notified of these deficiencies and summoned to appear in enforcement actions, Defendants have failed to respond. The City notes that in *City of Cleveland v. Wash. Mut. Bank,* 125 Ohio St.3d 541, 929 N.E.2d 1039 (2010), the Ohio Supreme Court held that corporate defendants, against whom the City of Cleveland filed misdemeanor complaints based on housing code violations, may not be tried in absentia by local courts even if the defendants fail or refuse to appear to answer the complaints. This ruling limits the Cincinnati's options in pursuing its claims against these Defendants. Moreover, due to the extremely fluid nature of the property market and the role of mortgage servicers with respect to the individual properties, the City (and even the Defendants, in some instances described in the complaint) cannot identify the actual owner of some of these properties on any given day.

The City further alleges that it has attempted to communicate with Defendants regarding the nuisance properties to no avail. Eighty-one of the identified Deutsche Bank-owned properties, and 54

of the Wells Fargo-owned properties, are vacant but Defendants have not obtained the required Vacated Building Maintenance License from the City. Several of the properties became so dilapidated that the City paid to demolish them. As part of their ongoing business practices, Defendants have sold many of these properties in "as is" condition to investors or speculators, many from out of state, for extremely depressed prices and without disclosing the true condition of and the outstanding violations filed against the properties.

The City's complaint asserts five claims for damages under several sections of the Cincinnati Municipal Code (Counts 1–5); statutory public nuisance claims that seek a remedial order concerning the properties (Counts 6–7); common law claims alleging that Defendants' business practices, and the specific properties owned by Defendants, are public nuisances (Counts 8–9); a claim for a declaratory judgment under Ohio law (Count 10); a claim that Defendants have intentionally interfered with the City's fiduciary public trust duties owed to its citizens (Count 11); and a claim for punitive damages (Count 12).

Defendants removed the case on the basis of diversity jurisdiction. This Court granted Defendants' motion to realign the Hamilton County Treasurer, finding that its interests were not adverse to the City's claims. Because complete diversity existed among the realigned parties, this Court denied the City's motion to remand. (Doc. 51) All of the Defendants now seek dismissal on a variety of grounds.

## ANALYSIS

### I. *Standard of Review*

Defendants' motions are brought under Fed. R. Civ. Proc. 12(b)(6), and argue that the City's complaint fails to state a claim upon which relief may be granted against any of them. In reviewing a motion to dismiss, the Court accepts the well-pleaded factual allegations of the complaint. The complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). A claim will survive if the allegations are ". . . enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir.2008), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). And in *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court reaffirmed *Twombly* and held that a complaint must allege facts that, if accepted as true, state a plausible claim for relief.

### II. *The Non–Trustee Deutsche Bank Entities Motion* (Doc. 40)

Deutsche Bank National Trust Company (DBNTC), Deutsche Bank Trust Company Americas (DBTCA), and Deutsche Bank AG (DBAG), all named individually as Defendants, filed a joint motion to dismiss. The motion states that DBNTC and DBTCA are separate corporate entities that are each wholly-owned subsidiaries of Deutsche Bank Trust Corporation (which is not named as a defendant). DBAG is the ultimate German parent corporation of the subsidiaries. These moving Defendants collectively argue that none of them own or have ever owned any property that is at issue in this case. And without an ownership interest in any of the allegedly "nuisance properties," they contend that the City lacks standing to bring any claims against them. Because all of the City's claims are premised actions and inactions concerning properties that are or were "owned" by one of the Defendants, the City's complaint fails to state a plausible claim against any of these three Defen-

dants who are each sued directly in their corporate capacities.

DBNTC and DBTCA concede that they act as trustees for certain residential mortgage-backed securitization trusts that do own properties in the City, but they note that any such interest is held solely in their capacity as Trustees of those trusts. They cite well-established law that distinguishes conduct by an entity acting on its own behalf from that within its capacity as a trustee. See *Union Guardian Trust Co. v. Detroit Trust Co.*, 72 F.2d 120, 121 (6th Cir.1934), noting that a trust company acting in its capacity as trustee for certain bondholders acts in "an entirely different capacity" when it acts in its individual capacity as a bank trust company. They also cite the basic legal principle that a parent corporation is generally not liable for the conduct of its subsidiary, and argue that the City has pled no facts suggesting that DBAG, the foreign corporate parent, is in any manner liable to the City.

The City responds by summarizing its allegations, and stressing that they are directed at all of the "Deutsche Bank" entities. It argues that these moving Defendants all engage in "business practices" of failing to maintain properties, and making decisions to comply with local codes only when it is in their economic self-interest. The City argues these are sufficient to avoid dismissal. The City also suggests that its complaint encompasses noncompliant properties that these moving Defendants might have acquired after the complaint was filed, or those that might be acquired at some point in the future, which the City contends is sufficient to confer standing.

■ The Court notes that the City's complaint specifically alleges that the properties it has identified as nuisance properties are all owned by Defendants "as Trustees." (Doc. 29, ¶ 13) All of the

"business practices" the City targets relate to decisions or inactions with respect to owned properties. In response to this motion, the City has not identified any property that was owned or legally titled in the name of any of these three entities. It is not enough for the City to allege that one of these Defendants might acquire title to some property sometime in the future, and then decide not to maintain it or to comply with City ordinances.

The City also broadly alleges that "Deutsche Bank" (which it defines as all of the entities named in the complaint) engages in "business practices" that resulted in a stock of blighted properties in the City. This blanket allegation against several related corporate entities is not sufficient, especially in view of the City's express allegation that the properties it targets are owned by trusts for which DBTCA and DBNTC act as trustees. It is not enough for the City to assert that every corporate entity with "Deutsche Bank" in its name engaged in the complained-of business practices or owned some property without some factual allegations that make such a claim plausible. In *Ashcroft v. Iqbal*, 556 U.S. at 680–681, 129 S.Ct. 1937, for example, the Supreme Court held that plaintiff's conclusory allegations that the Attorney General was the "principal architect" of an allegedly discriminatory detention policy aimed at Arab Muslims, and that the FBI Director was "instrumental" in implementing that policy, were insufficient to support a plausible claim. While plaintiff's allegations against other defendants more directly involved in his detention and mistreatment were not in dispute, the Court held the broad-brush allegations that these high level officials created and intentionally executed "discriminatory policies" did not state a plausible claim against them.

Here, the Court must conclude that the City's complaint is insufficient to state a plausible claim against DBAG, the foreign parent corporation, or against DBNTC and DBTCA as individual corporate entities. It is not sufficient to allege that DBNTC and DBTCA as individual entities **and** in their trustee capacities are liable to the City without some facts supporting such dual capacity liability. For these reasons, the Court grants the motion to dismiss filed by the three non-trustee Deutsche Bank entities.

### III. *Wells Fargo Bank and Deutsche Bank Trustees* (Docs. 38 and 41).

The Court will consider these motions together, as all of these Defendants raise many similar arguments with respect to the City's claims against them. For ease of reference and unless otherwise indicated, the Court will refer to DBNTC as Trustee and DBTCA as Trustee of various mortgage-backed securitization trusts collectively as the "Deutsche Bank Trustees," and will refer to Wells Fargo Bank and Wells Fargo Bank acting as trustee of specific trusts collectively as "Wells Fargo."

### A. *Common Law Nuisance Claims*

Claim Eight alleges that the Defendants' "property maintenance business practices" are a common law absolute public nuisance. Claim Nine alleges that the "non-compliant properties" (those subject to condemnation, vacate/keep vacant, barricade, or VBML orders) constitute a common law nuisance.

The City alleges that Defendants acquired title to hundreds of residential properties, and are therefore required to comply with various property maintenance laws and ordinances. Once Defendants take title, however, they fail to comply with those laws which are intended to protect the public health, safety and welfare. Defendants routinely resell the properties in nuisance conditions to third parties in violation of Ohio Rev.Code 5302.30, and fail to disclose to their purchasers the code violations and/or citations that exist on the properties. The failure to maintain the properties in compliance with minimum legal standards creates a danger to the public and the surrounding community. Defendants' willful refusal to maintain after notice from the City imposes additional costs to monitor and/or demolish the properties, additional fire and police response costs, and the loss of tax revenues generated by these properties. As a result, the City faces an enormously increased financial burden caused by Defendants' practices and the growing stock of nuisance properties.

With respect to the City's claim regarding their "business practices," the Defendants seek dismissal on several grounds. They argue that Ohio law preempts this claim entirely, or at least preempts the injunctive relief the City seeks; that Ohio's economic loss doctrine bars any claim for damages; that the City has not adequately pled proximate cause of its alleged damages; and that their alleged nuisance-creating business practices do not interfere with a "public right," a required element of a claim for public nuisance. They also contend that the City's request for an injunction against their "business practices," or ordering them to "obey the law," lacks required specificity and cannot be enforced.

Preemption was raised by the defendants in *City of Cleveland v. Ameriquest Mortgage Securities,* 621 F.Supp.2d 513 (N.D.Ohio 2009), aff'd on other grounds by *City of Cleveland v. Ameriquest Mortgage Securities,* 615 F.3d 496 (6th Cir.2010). There, the City of Cleveland sued a group of financial institutions involved in sub-

prime lending, alleging that the practice constituted a public nuisance. The City alleged the sub-prime lending initiated a cycle whereby unqualified individuals obtained mortgages but were unable to afford the payments, resulting in an increased rate of home foreclosures that led to more vacant and neglected housing, which in turn led to higher crime rates, and increased municipal expenses. The district court held that the City's nuisance claim was preempted by Ohio Rev.Code 1.63, which reserves to the state the sole authority to regulate the business of "originating, granting, servicing, and collecting loans and other forms of credit." See also, *Am. Fin. Servs. Ass'n v. City of Cleveland*, 112 Ohio St.3d 170, 176–177, 858 N.E.2d 776 (2006), invalidating municipal ordinances regulating predatory lending because they were preempted by state law.

■ Here, the City of Cincinnati is not directly attacking an otherwise lawful business practice, such as the Defendants' roles as trustees of the securitization trusts. But to the extent that the declaratory and injunctive relief the City seeks would infringe on the Defendants' practices governing the origination or collection of mortgage credit, such relief would be preempted. For instance, Wells Fargo argues that some of the foreclosed properties have unremedied code violations existing at the time they are auctioned at sheriff's sales, and if the property fails to sell then Wells Fargo takes title. An injunction forbidding this "business practice" of taking title to these properties would intrude on its business of servicing and foreclosing mortgage loans. Wells Fargo also argues that the City seeks an injunction requiring it to maintain properties that it has demonstrated it does not own, or to maintain a property whenever a foreclosure process begins even though it does not hold legal title during that time. The

City also seeks to prohibit the sale or transfer of any property Defendants may own without prior notice to the City. These forms of relief would be preempted by the statute as they would attempt to regulate mortgage loan servicing and collection.

Moreover, the Defendants argue that an absolute public nuisance (alleged in the City's claim concerning their business practices) is a strict liability claim premised upon inherently injurious conduct that is intentional or plainly unlawful, and that unreasonably interferes with a common public right. See *City of Cincinnati v. Beretta USA Corp.*, 95 Ohio St.3d 416, 419–421, 768 N.E.2d 1136 (Ohio 2002). Most of the "practices" the City targets are not inherently dangerous nor are they unlawful, such as foreclosing on mortgage loans, taking title to dilapidated or abandoned buildings, or selling properties at firesale prices. Even if these sorts of practices were actionable absolute nuisances, the City must also demonstrate that its damages were proximately caused by those practices. Defendants argue the City has failed to do so, as any proximate causal link between the targeted practices and the City's alleged damages is too indirect and attenuated. The causes of debtors defaulting on mortgage loans, of failing to maintain their homes prior to foreclosure, or the City's shrinking property tax base and value reductions, are varied and complex. Defendants argue that the City has not and cannot demonstrate a direct causal link between any of their "business practices" and the damages that City alleges flow directly from these conditions.

■ The district court found proximate cause lacking in *Cleveland v. Ameriquest, supra*, a conclusion that was specifically affirmed by the Sixth Circuit; see *City of Cleveland v. Ameriquest*, 615 F.3d 496, 502–506 (6th Cir.2010). The Sixth Circuit rejected the City's contention that proxi-

mate cause involves factual disputes that cannot be resolved under Rule 12. Applying the "directness" requirement in proximate cause analysis that was articulated in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the court held the City's allegations of increased municipal expenditures and decreased tax revenues, vacant buildings and increased crime, were not directly linked to, and were not proximately caused by the defendants' subprime lending activities.

While Cincinnati's claims in this case are not against remote lenders as were the City of Cleveland's, the damages the City alleges with respect to Defendants' "business practices" are similar to those that Cleveland alleged: neighborhood blight, increased costs, decreased revenues, and increased crime. The City's factual allegations with respect to the proximate causal link between these sorts of damages and the Defendants' "business practices" are insufficient to satisfy proximate cause standards set forth by the Sixth Circuit.

■ In addition, the Court must also conclude that Defendants are correct in contending that the economic loss doctrine bars the City's common law nuisance damage claims. The Ohio Supreme Court recently reaffirmed Ohio's well-established rule: "[A] plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Corporex Development & Construction Management, Inc. v. Shook*, 106 Ohio St.3d 412, 835 N.E.2d 701, 2005 Ohio 5409 (2005) (internal citation omitted); see also *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 615, 653 N.E.2d 661 (1995). The City alleges that as a result of Defendants' practices, it has incurred costs to remediate or demolish properties, increased police and fire costs,

increased inspection and monitoring costs, and loss of tax revenues. In *Cleveland v. Ameriquest*, 621 F.Supp.2d at 522, the district court applied the economic loss doctrine to Cleveland's public nuisance claims, relying on two cases applying Ohio law that reached that result: *Ashtabula River Corp. Group II v. Conrail Inc.*, 549 F.Supp.2d 981 (N.D.Ohio 2008), and *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, 2006–Ohio–5014, 2006 WL 2777159 (Ohio 8th Dist.App.2006). Both of those cases alleged public nuisance claims, and both courts held that the economic loss rule applied.

The City responds that in *City of Cincinnati v. Beretta*, 95 Ohio St.3d 416, 418–419, 768 N.E.2d 1136 (2002), the Ohio Supreme Court held that the doctrine did not apply to a common law nuisance claim. In that case, the City brought nuisance and product liability claims against a group of firearm manufacturers, alleging that their design, sales and distribution practices fostered the criminal misuse of guns and helped create an illegal firearms market in Cincinnati, creating a public nuisance. The City sought injunctive relief and damages. The lower courts dismissed the complaint in its entirety on a number of grounds, but the Ohio Supreme Court reversed in part. The court rejected the manufacturers' primary contention that public nuisance law did not apply to product liability claims, and held that nuisance law is not strictly limited to claims involving real property. It affirmed the lower court's dismissal of the City's statutory product liability claims because that statute expressly bars recovery of economic losses. But the court also found that the City's common law negligent design and failure to warn product claims should not have been dismissed, because the adoption of Ohio's products liability statute did not

extinguish those claims as the lower court had concluded.

But there is simply no mention of the economic loss doctrine in the Court's discussion of the City's public nuisance claim. As the court observed in *Cleveland v. Ameriquest*, 621 F.Supp.2d at 524, the lack of discussion gives rise at best to a "weak implication" that if directly confronted with the question, the Ohio Supreme Court would hold that the doctrine does not apply to public nuisance claims. This weak implication fails, however, in view of the Supreme Court's decision in *Corporex Development, supra,* decided three years after *Beretta* and which does not mention *Beretta* at all. The Ohio Court of Appeals also applied the doctrine in *RWP, Inc. v. Fabrizi Trucking, supra,* decided several years after *Beretta. RWP* involved a common law nuisance claim by a telephone company's commercial customer against a county contractor that negligently severed the telephone company's buried cables during road reconstruction work. The customer's complaint alleged a loss of business and sought economic damages caused by the 72–hour lack of access to its telephone service that was critical to its business. The court concluded that plaintiff's negligence and public nuisance claims were barred by the economic loss rule. In view of all of these authorities, this Court is not persuaded that the Ohio Supreme Court would adopt the City's position, despite the City's contention that the court has never expressly held that the rule does **not** apply to a public nuisance claim.

The City then asserts that it has alleged non-economic harm, citing *Lawyers Cooperative Publishing Co. v. Muething,* 65 Ohio St.3d 273, 603 N.E.2d 969 (1992). That case does not rescue the City's claim. *Muething* involved negligence claims brought by a lawyer against a law book publisher, after the lawyer followed the publisher's recommended forms to prepare promissory notes for his client. The lawyer was eventually indicted by the state because the notes violated Ohio securities statutes; he was also sued by several of his client's investors. The lawyer alleged personal injuries (humiliation and loss of reputation) and property damage to his law practice, which the court noted were not merely economic in nature. The City suggests here that increased crime and blight, or increased risks to police and firefighters posed by vacant buildings, are the sort of non-economic harm which permits it to proceed. Putting aside the problems in the proximate cause analysis with respect to these types of damages, these intangible and difficult-to-measure effects do not involve the City's property, or amount to any injury that is personal to the City. The damages the City seeks are clearly economic ones that cannot be recovered in a public nuisance claim.

■ However, with respect to specific properties owned by the Defendants that are the subject of the City's ninth claim, the City may be able to demonstrate that it is entitled to some injunctive relief regarding some or all of these properties. The City's allegations paint a frustrating picture of the difficulties it has encountered in tracing legal title to many vacant or blighted properties over the past few years. Apparently the Defendants and their lawyers are not always immune from these difficulties. (See Doc. 29 at ¶¶ 24–28) And as the turnover rate increases and properties are "flipped" to investors or speculators, the City contends that it simply lacks time to prepare, file and serve code violation citations or nuisance complaints. In view of all of the City's allegations, the Court cannot conclude at this juncture that the City would be not entitled to any sort of injunctive or declaratory relief with respect to properties that are or

were owned by Defendants. To that extent, the common law nuisance claim will not be dismissed.

## B. *Statutory Nuisance Claims and Remedial Relief*

Claims Six and Seven are brought under Ohio Rev.Code 3767.41. This statute authorizes a court to enter an order that a building or structure is a public nuisance because it poses a danger to public health or safety. The court can order the owner to abate the nuisance within thirty days, or grant other forms of relief set forth in the statute. The statute does not permit recovery of general damages, but does permit a court to approve necessary abatement expenditures incurred by a defined "interested party," or by a receiver if one is appointed by the court.

Wells Fargo does not contest this claim with respect to the one property that is specifically identified in the body of the City's complaint (and perhaps another that may be owned by a trust for which the bank acts as trustee). But it argues that the title records and other documents establish that it does not own the rest of the properties the City alleges it owns, and in some cases never did. Wells Fargo submitted the affidavit of David Dunn, one of its attorneys, who reviewed the City's list of properties that Wells Fargo allegedly owns, and obtained title and transfer information from the County Auditor for each one. These records show that in many cases, the properties were transferred before December 2008 when the City filed its first lawsuit against these Defendants. A few were apparently never owned by any Wells Fargo entity. Others have been transferred over the past several years. (Wells Fargo also notes that the one property specifically identified in the body of the City's complaint, 1519 Republic Street, was transferred from HUD in December 2011 when the property already had outstanding code violations lodged against it.)

The Deutsche Bank Trustees raise similar arguments, noting that some of the properties the City alleges it owns were sold long ago. They also argue that the City has failed to allege that the Trustees exercised control over any of the properties, both because the City failed to identify the specific trusts that actually own the property, and because mortgage servicers are responsible for maintaining any foreclosed properties owned by the various trusts.

The nuisance statute clearly requires that any injunction or abatement order be issued against the **owner** of a building. Section 3767.41(C)(1) describes the powers of the court, and directs the court to determine if the **owner** was afforded an opportunity to abate the nuisance. If so, the court may grant an injunction and abatement order requiring the owner to comply. Other alternatives, including the appointment of a receiver, are available if the owner has been notified but refuses to comply. The Court finds nothing in the statute permitting the City (or another interested party as defined in the statute) to proceed against a **former** owner to abate a nuisance.

██ With regard to Deutsche Bank's arguments about control, which it raises repeatedly in its motion, the Court finds that it is not fatal to the City's complaint that it did not include the full name of the specific trust that owns or owned any of the properties. The full names of those trusts are very likely known to (or more easily ascertained by) the Trustees. In fact, the Deutsche Bank Trustees prepared a list of those trusts that it filed with their motion. (See Doc. 41, Exhibit A) The Trustees also claim that they are not responsible for trust-owned properties because unnamed servicers are responsible

for property maintenance. They submit excerpts from some of the "Pooling and Servicing Agreements" filed with the SEC by several of the securitization trusts for which a Deutsche Bank entity acts as trustee. (See, e.g., Exhibit C–4 to Defendants' request for judicial notice, Doc. 44 at PAGEID 7577–7582.) The excerpt states that the "Master Servicer" (in that case, Ameriquest Mortgage Company) will administer the mortgage loans held in the trust on behalf of the Trustee, and has the power to institute foreclosure proceedings and transfer title to REO properties owned by the trust. These unnamed servicers are not, to this Court's knowledge, identified in any property title documents, and these agreements do not confer property ownership on the servicers. As the Trustees repeatedly contend, statutory nuisance claims are properly directed at **owners**, not parties with whom those owners may have contractual relationships regarding maintenance responsibilities.

The Court will not attempt to review and compare the voluminous materials submitted by the parties detailing the history of the properties identified in Exhibits B and C to the City's complaint, and the documents filed with Defendants' request for judicial notice (Docs. 35, 43, 44). The addresses of the owned properties are or should be known to Defendants, and all parties are on notice of the addresses of the properties the City alleges were at issue when it filed its complaint. The Court assumes that the parties will work together to properly identify properties that are owned (or were owned when the complaint was filed) by Wells Fargo (directly or as trustee) or by any of the Deutsche Bank entity trusts. The City's nuisance claims with respect to those specific properties will not be dismissed on the pleadings.

## C. *Interference with the City's Fiduciary Duty to its Citizens*

■ Defendants seek dismissal of the City's eleventh claim, alleging that the Defendants intentionally interfered with the City's public duties owed to its citizens. Defendants argue that Ohio law does not recognize such a claim. The City responds that its claim is analogous to one for intentional interference with contract. It notes that the City Charter requires the City to enforce its laws and ordinances, and contends that Defendants' "systematic violation" of those laws "interferes" with its charter duties to protect its citizenry.

Intentional interference with a contract is premised upon the existence of a specific contractual relationship between two parties, with rights and duties defined by the bargained-for contract. The party claiming interference must show that the wrongdoer knew about the contract and acted intentionally to interfere with one party's rights under some aspect of that contractual relationship. The elements of this tort claim do not, as the City suggests, readily fit the City's allegation that Defendants have intentionally interfered with its duty to its citizens to "enforce the law." The City cites *State v. McKelvey*, 12 Ohio St.2d 92, 232 N.E.2d 391 (1967), but that case stands for the unremarkable principle that a public office is a public trust, and an elected official is a fiduciary of the citizens with respect to the public fisc. A public official is therefore forbidden from using his position for his private profit. That case is inapposite to the City's alleged claim. The City cites no legal precedent for its interference claim, and this Court has found none. The Court cannot conclude that if presented with the issue, the Ohio Supreme Court would recognize such a claim based upon the City's allegations in this case. The City's eleventh claim is therefore dismissed.

## D. *Punitive Damages*

■ Count 12 of the amended complaint is a free-standing claim for punitive damages. Ohio law generally permits recovery of punitive damages only with respect to certain tort actions in which compensatory damages are awarded. The City responds that it intends to seek punitive damages if it is successful on its tort claims, and includes recovery of punitive damages and attorneys fees in its prayer for relief. An independent claim for punitive damages is not recognized in Ohio, and this claim is therefore dismissed. The prayer for relief is sufficient to preserve the City's right to seek such damages, should it be entitled to do so under some legal theory. The Court expresses no opinion on the merits of that issue.

## E. *Municipal Code Violation Claims*

■ Claims One through Five of the complaint allege that the Defendants are liable under several Cincinnati Ordinances with respect to the properties they own or owned for their failure to comply with these ordinances. These ordinances include Cincinnati Municipal Code Sections 1101–57.6 through 75.6 (costs incurred to demolish or barricade buildings); Section 1101–129, the City's Vacant Building Maintenance License ordinance; various violations under Section 1501–5, 1501–7, and 1501–9; re-inspection fees under Section 1101–111; and weed and litter regulations under Sections 714–45, 47 and 731–11.

Wells Fargo does not seek dismissal of these claims at this juncture. The Deutsche Bank Trustees repeat their arguments that they did not own most of the properties the City alleges they own, and that the City failed to identify the specific trusts that own or owned any of the properties. They also argue that the City's complaint and exhibits do not document any violations on 51 of the 208 properties allegedly owned by the Deutsche Bank Trustees. These are factual matters which the Court will not attempt to resolve at this juncture of the case. The City's municipal ordinance claims will not be dismissed as to any property that was owned by Wells Fargo or one of its trusts, or by a Deutsche Bank trust, and which the City alleges was in violation of these ordinances. The complaint alleges that the City sent "hundreds of notices" regarding violations on various properties the Defendants owned, and that allegation is sufficient at this juncture to avoid dismissal of these claims with respect to properties actually owned by any of the Defendants or by the trusts for which they acted as trustees.

## F. *Res Judicata*

■ The Deutsche Bank Trustees argue that the City's complaint in this case is barred by Ohio's "double dismissal" rule and the doctrine of res judicata, because the City previously brought and dismissed similar claims in two prior lawsuits filed in state court. The City responds that in the first lawsuit, it filed cross-claims against DBNTC which were later voluntarily dismissed. The second was a lawsuit by the City against "DBNTC as Trustee" (and others), which the City voluntarily dismissed in August 2011. As the Deutsche Bank Trustees repeatedly argue, DBNTC and DBNTC acting as trustees for specific securitization trusts are separate legal entities. While the claims brought in the prior suit are similar to those brought in this case, they were not brought against the same entity. The Court rejects the Deutsche Bank Trustees' argument that res judicata bars the City's claims against them.

## CONCLUSION

For all of the foregoing reasons, the Court grants the motion to dismiss filed by

Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, and Deutsche Bank AG. (Doc. 40)

The Court grants in part and denies in part the motions to dismiss filed by the Deutsche Bank Trustees (Doc. 41), and by Wells Fargo (Doc. 38). The parties are referred to the Magistrate Judge for a scheduling/status conference.

SO ORDERED.